## UNITED STATES v. SCHINE CHAIN THEATRES, Inc., et al.
### Civil Action No. 223.

District Court, W. D. New York.
Oct. 8, 1945.

See also, D.C., 4 F.R.D. 109.

Wendell Berge, Asst. Atty. Gen., Robert L. Wright, John F. Clagett, Harold L. Schilz, Albert Boggess, and Philip Marcus, Sp. Assts. to Atty. Gen., Milton A. Kallis, Sp. Atty., of Washington, D. C., and George L. Grobe, U. S. Atty., of Buffalo, N. Y., for the United States.

Willard S. McKay, of New York City, and Edward F. McClennon, of Boston, Mass. (Saul E. Rogers and Arthur J. Homans, both of New York City, Arthur E. Whittemore, of Boston, Mass., and Howard M. Antevil, of Gloversville, N. Y., of counsel), for defendants.

KNIGHT, District Judge.

This suit is brought by the United States to restrain violations of Sections 1 and 2 of the Sherman Act. 26 Stat. 209, 15 U.S.C.A. §§ 1 and 2. Schine Chain Theatres, Inc., a New York holding and service corporation, five other corporations in which Schine Chain Theatres, Inc., owns all of the stock, to wit, Schine Theatrical Co., Inc., an operating company, Schine-Lexington Corporation, a holding company, Schine Enterprise Corporation, a service corporation, Schine Circuit, Inc., a service corporation, and Chesapeake Theatre Corporation, a holding corporation, and also three individuals, J. Meyer Schine, Louis Schine and John A. May, are the defendants. Hereinafter the corporate defendants will be referred to as "Schine," the "Schine Circuit" or as "the Circuit."

This organization has seen an exceedingly rapid growth. Its origin was the purchase by defendants J. Meyer Schine and Louis Schine of three theatres in Gloversville, New York, in 1920. In the twenty-one years following, these defendant corporations acquired, either as purchaser or as lessee, an interest in 175 theatres and in addition some 42 separate parcels of real estate for theatre purpose, or connected with such purpose. The development came about in this manner: Schine Chain Theatre, Inc., the parent corporation, was organized in 1920. The above-named subsidiary corporations came into being in the several years 1926, 1935, 1936, 1937, and 1938.

Steps following in line with the purpose of the "Schine Circuit" were the organization of realty holding corporations and what may be termed local corporations, or the taking over of others of such for the operations of theatres. Since 1931, there have been 118 theatre corporations in which an interest has been acquired by "Schine." As of the time of the commencement of this suit there were 62 of such operating corporations and in 48 of these "Schine" owned 100 per cent. of the stock, in 12, 50 per cent. Schine operates 93 theatres in 73 towns (including cities). The towns run generally in population from 5000 to 35000 and include 39 in New York, 16 in Ohio, 8 in Kentucky, 7 in Maryland, 2 in Delaware and 1 in Virginia. In addition to its theatrical and realty operations, "Schine" has booked and bought for and supervised 37 theatres since 1931, and when this suit was brought there were 27 for which it so acted. Since 1928 the closed towns (those in which

there was no opposition) show a total increase of 56. In 1941 there were only 3 towns in which Schine's competitors (hereinafter called independents) were playing major film product. In a single season, 1939-1940, Schine paid $1,647,000 to six film companies. The "Schine Circuit" buying power beyond peradventure was extremely large, and its opportunity to utilize this power in the purchase of films to the detriment of its competitors is apparent. These defendants together control the largest independent theatre circuit in the country. For theatre acquisitions and capital improvements there has been expended admittedly upwards of $10,948,100, not including dividend payments on operating expenses and cash on hand.

Some of the computations as hereinbefore shown are not the same as those claimed either by the government or by the defendants. These computations are made from defendants' extensive answers to interrogatories. The differences are not of material moment. There are eight so-called major film companies: Fox, Loew, Paramount, Radio-Keith-Orpheum (RKO), Warner, Columbia, Universal and United Artists. Columbia and Universal produce and distribute films; United Artists only distributes; and the other companies both produce and distribute films and operate theatres. These eight companies supply "Schine" a large per cent. of the feature films used by him and together receive upwards of 75 per cent. of the total film rental paid by Schine. All of them originally were made parties to this suit, but all have since been dropped as such. However, each is claimed to have participated separately with Schine in the conspiracy charged and in aid of Schine's monopolization of the film exhibiting business. The principal sales office of each major distributor company is in New York City and that city serves theatres here involved. The methods of licensing and servicing of films is similar with each. Each has its district manager and branch manager. The feature films are mostly produced in California where the negatives are taken, the prints being generally manufactured in New York and New Jersey. Film license applications are solicited by salesmen from the branch office, and the delivery and return of films are made through the branch. Prints of films are sent from the various exchange offices in the various states to the exhibitors of the main office, though the recommendation for approval ordinarily is made by the branch manager who is close to the situation. It was the usual custom for the distributors to make license agreements for feature films for a period of a year commencing about September. These license agreements were made before the films were produced. Ordinarily each major producing company put out 40 to 60 feature films a year and these were released at the rate of about one a week. Now the practice generally is to sell group pictures only after production and in groups rather than for a year.

The individual defendants hold the principal offices in the defendant corporations and hold other offices in the various so-called local corporations. They are the principal stockholders in the parent corporation and have general supervision of the operations of the circuit. The film buying for the circuit and the companies in which it had an interest was conducted through "Schine" or one of its subsidiaries. Lazar, a regional manager for "Schine" covering several states, and Silverman and Hensler, district managers, and one Insley, principally carried on negotiations for acquisitions, though the defendants Schine and May engaged directly in some, while one Lynch was "the Circuit's" chief film buyer. In Circuit buying "Schine" generally negotiated deals with the division manager. The agreements so made are referred to as "master agreements and deal sheets," but these were usually followed by license agreements signed by the chief sales executive of the distributors.

To substantiate its claims that these defendants have violated the aforesaid provisions of the Sherman Act, the government contends that they have used their great buying power to suppress competition by bringing about various restrictions on the competitors' ability to compete, resulting in persuading the competitor either to sell to "Schine," operate on an inferior basis or join in pooling his interests with "Schine"; that this suppression has been brought about in various ways, to wit: by depriving independents of first and second run products, either entirely or to such a time as materially lessened income and force sales or abandonment, by implied threats voicing "Schine's" great buying power, by threats to construct theater buildings to discourage other construction, by cutting admission prices, by inducing theatre sales through agreements to employ sellers, by fixing by agreement the duration of

time and the distance within which an independent selling should not be permitted to compete and by unreasonable clearances obtained from the distributor. These generally are the claims. The defendants' denial makes the issues.

Section 1 of the Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States * * * is hereby declared to be illegal * * *," and

Section 2 of that Act provides that "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, * * * shall be deemed guilty of a misdemeanor."

Said the court in Northern Securities Co. v. United States, 193 U.S. 197, 404, 24 S.Ct. 436, 469, 48 L.Ed. 679: "All that is added to the 1st section by § 2 is that like penalties are imposed upon every single person who, without combination, monopolizes, or attempts to monopolize commerce among the states; and that the liability is extended to attempting to monopolize any part of such trade or commerce." "* * * the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129.

Any question as regards the applicability of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, in certain respects here shown has been clearly answered by the decision of the Supreme Court in United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254. Under definitely comparable facts that Court held: 1. That this court has jurisdiction. 2. That it is immaterial whether the distributors or any one of them were members of a conspiracy or joined in the effort to monopolize. 3. That while the business or the showing of motion pictures is local, a combination of exhibitors may violate the Sherman Act by using their collective buying power to restrict or restrain competitors. 4. That the relationship between the circuit members is such that they may be capable of conspiring or combining with each other in violation of the Act. 5. That the circuit, in essence, is not a single exhibitor. "All three phases of the motion picture business * * * constitute a part of interstate commerce."

William Goldman Theatres, Inc., v. Loew's, 3 Cir., 150 F.2d 738, 742.

In the Crescent case [323 U.S. 173, 65 S.Ct. 259] twelve theatre operating companies, and certain individual stockholders, as well as distributor companies, were charged with the violation of the Sherman Act in combining with each other and with major distributors to effect monopolies. This language from the opinion supports the statement as to the aforesaid conclusions: "And as we have said, the course of business which involves the regular exchange of films in interstate commerce is adequate to bring the exhibitors within the reach of the Sherman Act." and "The District Court found that some of the exhibitors were co-conspirators on certain phases of the program. But we can put that circumstance to one side * * *. For it is immaterial whether the distributors technically were or were not members of the conspiracy." and "But action by a combination of exhibitors to obtain an agreement with a distributor whereby commerce with a competing exhibitor is suppressed or restrained is a conspiracy in restraint of trade and a conspiracy to monopolize a part of the trade or commerce among the States." Sustaining the action, the court necessarily held the Circuit is not in essence a single exhibitor; and that there can be concerted action between a corporation and its wholly owned subsidiaries, and the fact that defendants owned one-half or less percent. of the stock of corporations who are not parties herein does not preclude consideration of acts done by these corporate officers or by defendant's acts in connection with such corporation. Vide also: Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; Paramount Famous Lasky Corporation v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; General Motors Corporation v. United States, 314 U.S. 708, 62 S.Ct. 52, 86 L.Ed. 565.

The defendants assert that buying the only theatre in a town and building additional theatres, or buying additional theatres, or advising of intention to open another theatre, or making known the product buying ability of the chain, or buying prod-

234

uct on better terms than a competitor, or becoming large by normal growth, causing inability of inferiorly operated theatres to get good product, or agreeing with the seller of a theatre not to compete within defined limits for any period of time, cutting or raising admission prices, obtaining clearances, or using so many pictures that demand for product of minor distributors is increased, does not monopolize or restrain trade or commerce among any of the several states. "We may assume that if a single exhibitor launched such a plan of economic warfare he would not run afoul of the Sherman Act." Crescent case, supra. Obviously, doing any one of the aforementioned things, disassociated from any other act, would not be violative of the Sherman Act; but surely a circuit may so utilize one or more of such efforts as to illegally stifle competition or monopolize the theatre business in different locations. Motive is essential.

■ The defendants say that the Sherman Act prohibits only unreasonable restraint of trade and that it must affect trade or commerce between states. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. There can be no question that this is a correct statement of law. The Act does not condemn monopolies as such, but prohibits monopolization or attempts to monopolize trade or commerce between the states. The verb monopolize comprehends conduct or actions. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734. Through monopolization a monopoly may be secured. We are concerned here with what are claimed to be unreasonable restraints of trade. The word unreasonable as so used is broad enough to include a conspiracy in restraint of trade and monopolization of a business in restraint of trade. Unreasonable, as used in the statute, refers to a degree of restraint. Defendants further assert that the Act does not condemn restraints of trade which do not have a direct and immediate effect upon interstate commerce. The contrary of this assertion, as applicable here, is decided by the Crescent case, supra. Defendants also say that an agreement for purchase of product coupled with clearances over succeeding runs is valid, citing Standard Oil Co. v. United States, supra. Of course, the mere agreement for the purchase of first runs and reasonable clearances is within

the law; but the charge of a conspiracy contemplates a "combination of two or more persons by some concerted action to accomplish * * * an unlawful purpose" and monopolization contemplates acts to monopolize or control trade or commerce between the states to the exclusion and disadvantage of others.

The record herein includes 4728 pages of testimony and 1380 exhibits. We are here concerned with 32 different situations, each involving the testimony of various witnesses and numerous exhibits. It is not only practically impossible to set out in this opinion every phase of the testimony which has been presented, but it is unnecessary.

Many objections were raised by the defendants to the reception of evidence of inter-department communications and statements of and communications from representatives of the distributors. These objections were based, both on the ground that such were incompetent in the absence then of proof of a conspiracy, and also that there was no proof of the authority of such representatives to make the declarations or give the communications.

■ It is not necessary that proof of the conspiracy be made before overt acts are proved. The order of the proof lies within the discretion of the court. "There is no hard and fast rule that the evidence of concert should be first put in. * * * The order of production of evidence is one largely in the discretion of the court." Doyle v. United States, 6 Cir., 169 F. 625, 627. Among other cases supporting this view are: Eastern States Retail Lumber Ass'n v. United States, 234 U.S. 600, 34 S. Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Cohen v. United States, 2 Cir., 157 F. 651, certiorari denied 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357; Paramount Pictures, Inc., v. United Motion Picture T. O., 3 Cir., 93 F.2d 714. Glaser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, cited by the defendants, does not support their view.

■ Statements and acts of agents or representatives within the scope of their authority indubitably are admissible to show a conspiracy. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas. 1918B, 461; New York, Lake Erie R. Co. v. Winter's Administrator, 143 U.S. 60, 12 S.Ct. 356, 36 L.Ed. 71; Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F.2d

53. Further, in conspiracy cases a great deal of latitude is permitted the court in the reception of evidence. "[The rule] will be sustained, if the testimony which is admitted tends even remotely to establish the ultimate fact." Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 126, 40 L.Ed. 269. See also: Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Isenhouer v. United States, 10 Cir., 256 F. 842; White v. United States, 4 Cir., 80 F.2d 515.

▮▮▮ There is a conflict in the testimony in many of the situations. The court recognizes the burden is cast upon the plaintiff to establish its cause and/or causes of action by a fair preponderance of the proof. It is quite patent from the nature of the charges here that they have to be established by numerous acts and transactions having relation some way to the charge. These acts must be considered together to show intent, and intent to "combine," "conspire" and/or "monopolize" must be the reasonable and natural conclusions from the acts or transactions, as believed by the court. Ordinarily proof of such acts comes from circumstantial evidence and the inferences which are ordinarily drawn from these. As was said in William Goldman Theatres, Inc., v. Loew's, supra: "The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age." And further: "The requirement here is to fit the inference facts into the framework of the primary facts * * *." "It is elementary, however, that conspiracies are seldom capable of proof by direct testimony, and may be inferred from the things actually done, * * *." Eastern States Retail Lumber Ass'n v. United States, supra [234 U.S. 600, 34 S.Ct. 95.]

▮▮▮ It is the opinion of this court that the defendants have violated Section 1 and Section 2, supra, of the Sherman Act, in that they have maintained an unlawful combination among themselves by means of which they have unreasonably restrained trade or commerce among the several states and have monopolized the business of operating theatres and the supplying of major films in various towns and cities, and that each of the major distributors hereinbefore named, by the methods which it has employed in its dealings with Schine and the independents, has aided and abetted these defendants in unreasonably restraining trade or commerce between the states and the "monopolization" of theatre operations.

The great film buying power of the defendant corporations gave opportunity to exert pressure on the distributors to obtain preferences. The extent of this film buying is demonstrated by the exceedingly large number of theatres controlled by "Schine" and the large amount of money which must have been paid for film rentals. The aggregate of the amount paid all distributors in total or for one season is not shown, but what the "Circuit" paid six of the major distributors, for features for a single season, does appear. This buying power included both closed and open towns. By combining the open and closed towns in Schine's deals with the distributors, Schine was enabled to dictate terms to the distributors. This ability to dictate terms was further increased by the authority of Schine to buy product for theatres not owned or operated by it. Schine acquired by purchase or lease 55 theatres from 1922 to 1931, and 80 from 1936 to 1941, inclusive, 15 in 1938 and 15 in 1939.

The means and methods employed by the different defendant corporations through their officers and authorized representatives to obtain a "monopolistic" control were numerous. Principally among these were arbitrarily depriving independents of first and second run pictures, securing unreasonable clearances, making threats to build or open closed theatres to prevent construction or operation by independents, lowering admission prices, obtaining rental concessions, restricting independents who sold to Schine as to periods and places of operation, making long time franchise agreements covering the "Circuit."

Standing out as clearly indicative of intent to "monopolize" are communications and statements made by May, Lynch, Lazar, Hensler and Insley, undisputedly authorized representatives of the defendant corporations. There are others from defendant J. Meyer Schine as well.

Some specific instances showing the predatory means used by "Schine" follow.

The Schine defendants arbitrarily deprived independents of the first run product which they had previously enjoyed in several towns. Independents were deprived of 1936–37 Columbia product at Norwalk; 1935–36 Fox product at Van Wert and Bucyrus; Loew's product for 1930–31 at Bellefontaine and for 1935–36 at Van Wert; Paramount's 1935–36 product at

Van Wert and Bucyrus; RKO product for 1933–34 at Auburn and 1935–36 at Norwalk; of United Artists 1936–37 at Norwalk; and of Warner for 1933–34 at Norwich, 1936–37 at Norwalk, and 1941–42 at Harlan.

Independents were arbitrarily deprived of second run product which they had previously exhibited, losing 1938–39 Columbia at Rochester, Loew's 1935–36 at Van Wert and 1934–35 Warner at Watertown. After "Schine" secured the product from the independents for the aforementioned seasons, he retained it and the independent was unable to secure it in subsequent seasons. Relative to six towns including Corning, Lynch wrote on October 21, 1933, Metro: "If there are any other opposition towns where you believe you can sell a second run, I would appreciate it if you would take the matter up with me first before selling." In 1932 Lynch wrote Flynn a letter saying, among other things: "I want you to refrain from selling him (independent) any pictures whatsoever." and Metro through Flynn agreed not to do so. Lynch also wired Fox to withhold selling to this independent and wrote Fox' agent saying "have also asked him (Schmertz-Fox agent) to refrain from selling this man second run."

"Schine" was able to secure unreasonable clearances year after year in many towns. A few only need be mentioned. At Corning, New York, RKO permitted 90 to 180 days, and Fox permitted 160 days. At Seneca Falls, New York, Columbia and United Artists permitted 120 days. At Little Falls, New York, RKO, Columbia and Universal permitted 120 days and United Artists permitted 115 days. At Carthage, RKO permitted 120 days and United Artists 90. United Artists permitted 90 days at Watertown, New York, and 90 days at Amsterdam, New York; Bucyrus, Kent, Norwalk, Tiffin and Fostoria, Ohio; and Lexington and Van Wert, Kentucky.

The license contracts with "Schine" in many instances specified minimum admission prices for the various runs as well as clearance period. To an extent this affects adversely the time given the competitor. Interstate Circuit v. United States, supra, clearly points the reasons for condemning such provisions in a film license contract or agreement. Schine got clearance of Herkimer over Ilion where none existed before.

"Schine" made threats to build in various towns, such as Paris, where there was a sign up, Canandaigua by a sign and newspaper article published, and where he eventually did build. In Perry, a statement by May and a newspaper article announcing that land had been bought for theatre purposes came at a time when "Schine" was trying to purchase the independent's lease. "Schine" did not build, but later got the lease. In Salamanca, just after independents acquired a site for a contemplated theatre, through the press "Schine" announced its intention to build. In Medina, "Schine" announced the making of an agreement to erect a new theatre immediately after independents started construction. In Mount Vernon, May contacted the independent to buy, saying "Schine" would build unless the deal could be put through.

Defendants' authorized agents made statements to independents which are reasonably construed as threats.

At Bellefontaine, during negotiations for the renewal of a lease with an independent, Lazar threatened to re-open the Opera House, if the independent opened the Strand.

With reference to Paris, Lazar told the independent, who was taking steps to build, that if the independent went ahead with his projects "Schine" would build a 1200 seat theatre in Lexington where the independent had a theatre and that the house would be run with 10¢ policy at all times. At Paris, Schine and an independent began construction at practically the same time. Lazar asked the independent to stop construction and see him about a deal. Subsequently Schine took over the independent's Lexington and Paris theatres under an agreement prohibiting for fifteen years the independent from engaging in the theatre business in any town in Kentucky where Schine had a theatre.

Just before Schine acquired the "Forum" theatre in Norwalk, Lazar advised an independent to "get in with us * * * we are a big company. You know what it means if you are not in with us." And further stated: "If you lease your theatre Mr. William Selman (part owner of the "Forum") will walk out of town."

At Van Wert, the operator of the "Ohio" theatre could not get first run product it had had. During negotiations for the sale of the "Ohio" to Schine, Lazar said that Moore would have trouble getting product; Schine would have the first runs; and that Schine was interested in buying in order to raise prices.

At Lockport, during negotiations with "Schine" for the "Palace" theatre, May said it would be necessary to re-open the Hi-Art owned by "Schine" to use up "the large volume of product they had bought." This statement evidently was made to induce Reliance to sell the "Palace." In this instance it is to be noted that the independents experienced great difficulty in getting product. Hi-Art had then been closed for seven years. Metro, Fox, Universal and Loew's refused major product to the independent. Indicative of the attitude of the distributors is the letter from the Eastern Salesmanager of Loew's who wrote:

"In our negotiations with the Schine interests it will very likely be that we will have to give them consideration for our product at Lockport, as well as other situations, and as we are hardly in a position to forego or jeopardize the business from their other situations, and for the further reason that they have for a number of years been a very representative account, we feel that our interests would be best served by giving them such consideration."

At Perry, May told the independent that "Schine" had bought a lot to build a 1000 seat theatre there. This was a town of less than 5000 population. The independent theatre building was owned by the town and leased to the independent. When May said this, a local newspaper article to the same effect was given out. Schine did not build but Herzberger sold shortly thereafter, and through the purchaser of this interest Schine acquired the lease.

Insley and May tried to buy an independent's theatre at Seaford and Georgetown. Insley said it was foolish that the independent did not make a deal with "Schine" because he had recently purchased the theatre at Laurel and "very likely, with the buying power they had they would get away the product" from the independent. Insley said Schine had bought a lot with the intention to build a theatre in Seaford, and also said: "Well, if I were you I would sell the theatres to Schine because they are going to build a theatre there and, naturally, they are going to get the product." Insley, under a written contract with "Schine," had authority "in negotiations for the acquisition of motion picture theatres within the above-described territory" (Delaware, Maryland, Virginia). Seaford and Georgetown are in Delaware.

At Rochester, J. Meyer Schine told independents, who were then building the "Webster," that the location was not appropriate, that it was too near the "State" (Schine's) and not justified, and Schine said he would build a theatre near the Murray theatre (owned by independents). The "State" and the "Webster" theatres were ¾ mile apart. Schine later took over the "Webster." Schine testified he said that it would not be sensible to build the "Webster," but denied that he said he would build near the "Murray."

At Seneca Falls, after an independent had taken steps toward building a theatre, a sign was placed on the Seneca theatre (shortly theretofore purchased by Schine) which read: "Closed for alterations. Will re-open soon as a Schine theatre." Independent then discontinued efforts to build. "Schine" did not re-open. Practically the same things recurred two years later. The same independent took steps to build. The sign re-appeared on the "Seneca". The independent did not go through with his plan. The "Seneca" did not open. It had not been open in several years.

After Schine opened a theatre within a town, it was arbitrarily able to keep the independents from opening a theatre in the town with suitable run product, as in Auburn, Lockport, Mt. Vernon, Paris, and Bellefontaine.

"Schine" was able to monopolize first run product at Corbin, Medina and Lockport even though the physical facilities of the independents in those towns were better than Schine's. He was able to monopolize the first neighborhood run in Rochester even though the physical facilities of the independents were better.

The evidence discloses that "Schine" cut admission prices at Corbin, Geneva, Lexington, Malone, Ogdensburg and other towns; gave out cut rate tickets in Addison, good in his Corning theatre for students, and frequently engaged in two for ones and bank nights in other towns.

In cases of purchase or the assumption of leases other than those hereinbefore referred to, the agreements therefor provided for no competition by the independents for long periods of time. The non-competitive feature was also extended to cover outside towns, i. e.: Amsterdam, Ilion, Malone, Paris, and Lexington.

By reason of franchise agreements entered into prior to May 19, 1942 (voided thereafter, see Decree herein of that date), permitting special film rentals not given in-

dependents "Schine" was able to reap benefits unavailable to independents and these were utilized against independent operators as a means of restraint. These have a definite bearing on the competitive effect of buying power. Rather than make contracts for a single year, as appears to have been Schine's practice prior to 1936, he then began making such for a period of two or three years. These contracts included both the entire circuit and also those theatres for which Schine did the booking. The great buying power of "Schine" enabled him to obtain concessions not obtainable by independents. In 1936 Schine made a three year agreement with Fox, and as a result he obtained the Fox feature product in all the towns which "Schine" then operated, and this agreement was later made to include subsequently acquired theatres. In 1938 a subsequent three year agreement was made. These agreements provided for payment of certain percentage of gross receipts after deduction of operating costs, and also fixed minimum admission charges. With Loew in 1936, a four year agreement was made under substantially the same terms as made with Fox. In 1937 a comparable three year agreement was made with Warner; in 1938 a similar one with RKO; a similar two year one with Columbia in the same year and a three year agreement was made with Universal in 1939. In the instance of United Artists, a distributing corporation, separate contracts were made for each feature for all Schine theatres. Another feature of these agreements was in the inclusion of unfair and inequitable clearance provisions.

Proofs connecting the distributors with certain of the aforesaid acts of defendants come from the provisions of the franchise agreements and acts of the distributors, inter-department communications of the distributors and statements made by their authorized representatives, of which numerous ones have been set forth herein. It is hardly believable that the executive officers of the distributors did not know some of the methods employed by "Schine" in its efforts to restrict competition. Distributors' salesmen, branch managers and district managers are necessarily in constant touch with "Schine's" operations. By the very terms of the franchise agreements they insured strength against competition. These long term deals were made by each of the distributors, except United Artists whose term deals were necessarily somewhat different, and they were in effect profit sharing agreements and created a virtual partnership with "Schine." To the same end were the unreasonable clearances given "Schine" by each of the distributors. Attention has heretofore been directed to some of these. The plaintiff has submitted in connection with its briefs papers purporting to be arbitration awards fixing clearances in certain instances and which arbitrations are purported to have been made pursuant to the Consent Decree entered in the District Court of the United States for the Southern District of New York on November 20, 1940. These arbitration awards are not in evidence. They have no binding effect as res judicata or otherwise, and this court has not considered them as evidence. However, it is hardly necessary to look to any other decision to support the view that clearances of 180 or 120 or 90 or 60 days are not reasonable in the instances herein in which they have been allowed. It is true some of these were clearances over third runs but many were over second run. In numerous instances these unreasonable clearances were allowed over towns in which Schine did not operate, and some towns distant from 10 to upwards of 20 miles, and towns in which there were no theatres. Gloversville got clearance of 45 days over Johnstown, and "Schine" was given clearance both over Newfane and Mohawk where there were no theatres. Many clearances were over outside towns of comparably small population, distant so far that no clearance is justified, such as Randolph, Little Valley and Ellicottville, New York. Many recently were given over towns over which there had been no previous clearance. Metro gave clearance in Ashland over Londenville and Lodi, Ohio; United Artists gave clearance in Auburn over Skaneatelis, New York, and Fox in Hornell over Earlville, New York.

The record is replete with inter-department communications between major film representatives which recognize the unreasonableness of the clearances given to Schine at his demand. This is shown by the communications and representations made by Lehman of United Artists, Pielow of MGM, Dana and Sauber of Universal, Smith of Warner, and Sussman and Grassgreen of Fox, which are admissible in evidence because these men all held positions in their respective companies so that it was within the scope of their duties to make the representations in the communications that

they did as a natural incident of the office, i. e.: Branch or district manager.

Piclow, MGM resident manager, wrote: "I feel that in some of the situations (unnamed) (discussing Schine contracts), the clearance that he (Lynch) is demanding is unfair * * *." Dana, branch manager of Universal, wrote the district manager that he had asked Louis Schine relative to clearances over the Smalley circuit (Norwich) and that he refused to grant the privilege of serving the pictures with shorter clearance. Universal branch manager Sauber wrote Lynch that they wanted to serve Waterloo in less time than the 30 days clearance after Seneca Falls because other majors were, but Lynch refused though Universal had the right under its contract to so do. At Rochester Scully, of Universal, said it would be satisfactory if the Madison and Monroe came within the Schine 21 day clearance.

Smith, branch manager of Warner, wrote to the Home office that Canton would do more business if it were not for Schine at Ogdensburg having 30 days clearance and if it was reduced: "It will make a better condition for us all * * *." Smith also wrote relative to Seneca Falls stating that he hoped Lynch would break down their 60 days clearance: "As I told you this morning over the phone, the clearance set up is all wet * * *."

Sussman, of Fox, wrote to Grassgreen that the 60 day clearance in Glens Falls and elsewhere seemed excessive. Sussman went on to comment that he noted that 60 day clearance was given over second run at Malone when Fox had no second run in Malone, and furthermore, as previously stated, 60 days over second run seemed excessive. Grassgreen replied that while the 60 days at Glens Falls might seem excessive, Lynch insisted upon it. Grassgreen said that Schine insisted upon the 60 day clearance because they wanted to be consistent with their demands for 60 days over subsequent independent runs.

In certain instances the distributors refused to negotiate with the independents for runs not bought by Schine. Such are seen in the refusal of RKO, Fox, Paramount, MGM and Universal to furnish second run at Auburn; of MGM at Amsterdam until the "Schine" deal did not materialize; by United Artists at Geneva; and by RKO, Universal and Fox at Paris.

In many instances the distributors refused to negotiate with the independents for runs. After "The Circuit" came into the town, in many instances it was impossible for the independent to get a good run of major product, or even to have his requests to purchase considered. RKO would not sell to the independent after "The Circuit" came in for 1933–34 in Auburn, 1935–36 in Mt. Vernon; MGM would not sell 1930–31 in Bellefontaine, 1933–34 in Lockport and Norwich, 1935–36 in Van Wert, 1936–37 in Lexington, 1938–39 in Medina; Paramount would not sell 1933-34 in Lockport, 1934–35 in Auburn, 1935–36 in Mt. Vernon; Fox would not sell 1933–34 in Norwich, 1935–36 in Amsterdam and Mt. Vernon; Universal would not sell 1933–34 in Lockport, and Norwich; United Artists would not sell 1935–36 in Mt. Vernon and Van Wert; and Warner would not sell 1933–34 in Norwich, 1935–36 in Amsterdam, 1938–39 in Medina and 1941 in Norwich. In these instances, when the independent attempted to make application for product, he was simply advised that the product had been sold to "Schine" in a circuit deal.

Special privileges were granted, as in the option of paying a per cent. of the gross receipts from product or flat rental, and as in deducting cost of competitive devices (bank nights, etc.) from gross before computing the distributor's share.

Special license provisions were given by tying up second runs, as in Lockport and Corning.

In certain instances Schine's film contracts called for lower minimum admission charge than those for the independent for subsequent run. This happened in Lexington and Corning.

United Artists with respect to the Capitol theatre in Ilion wrote: "We do not want to encounter any difficulty with the Schine Circuits * * *, we want to be definitely assured that the clearance as submitted in the contracts is satisfactory to the Schine Company."

Sichelman, assistant sales manager for Fox, wrote Schine that Fox was free to sell ten pictures of first run and also 100% second run in Bellefontaine and that the branch manager was being directed to sell these. In reply, Lynch said, in part: "The only product which he (independent) has been able to buy has been from independent companies. There has not been a major company that has sold him any product. * * * We are charging a top of 40¢ admission * * * and we don't want to have the distributing companies make it

impossible for us to continue getting this price. * * * I have also written Mr. Schmertz advising him that we will take the remaining pictures which we did not buy first run, and, have also asked him to refrain from selling this second run house." Lynch also wrote to the Fox branch manager asking him to hold off selling the independent.

Further, Lynch wrote United Artists that "Schine" "should be allowed the privilege of playing pictures ahead of a situation (Sodus) charging a lesser admission price." To this the reply, in part, was: "Therefore, in the future, we will grant you fourteen days, or whatever clearance you see fit to take on towns like Elmira etc. in that locality." The Fox home office wrote its branch with reference to Glens Falls, second run: "I note that you have changed the clearances hereby providing for sixty days over third run Glens Falls. Sixty day clearances here and elsewhere seem to be excessive." And to this the branch manager replied that Schine always provided for this clearance over third run and "George Lynch insisted in carrying it through for the future."

There is much other evidence going to show the influence of "Schine" with the distributors to gain preference over independent competitors and also the cooperation of the distributors with "Schine" to the same end.

■ Sales managers for each of the major distributors who had authority to approve film leases, called by the defendants, gave testimony, in substance, that to their knowledge there has not been any conversations with any defendants or their executives or employees not to deal with any competing exhibitors to restrict the terms of such dealings. These sales managers can be only a small number of those employed as such during the period in question, and they speak only of their own knowledge. Some six branch and exchange managers have testified as to transactions in contradiction of the plaintiff's proof as to five of the situations in question. In Interstate Circuit v. United States, supra, the court said that the failure to call those officers who had authority to act for the distributors and were in a position to know whether they acted in pursuance of an agreement "is itself persuasive that their testimony, if given, would have been unfavorable to appellants." While that case was stronger with respect to the proof in this connection, the defense herein is weakened both by the failure to call others of the officers authorized to act and by the nature of the testimony given by these. "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. * * * Silence then becomes evidence of the most convincing character." Interstate Circuit v. United States, supra [306 U.S. 208, 59 S.Ct. 474.]

■ Proof herein that these defendants conspired is shown by something more than inferences, and this, together with the reasonable inferences to be drawn from the direct proof suffices to show intent to conspire.

It is recognized that the matter of clearances is of major importance in the consideration of the issues herein. One position taken by the defendants is that adequate relief in so far as clearances are concerned may be had under the Consent Decree hereinbefore mentioned in United States v. Paramount Pictures, Inc., et al. Such Consent Decree was for a trial period of three years from the date of its entry, and it further provided that during such period the petitioner, the United States, would not seek any relief prayed in certain sections of the petition and of the amended and supplemental complaint and in certain other directions. After the expiration of said three year period, the government filed an application for modification of the decree. The defendants therein not admitting the existence of violations to which the application for modification was primarily directed, the suit as originally brought has been continued and has not yet been determined. This seeks the divorcement of theatres from the film producing companies. It is to be noted that Columbia, Universal and United Artists were not parties to the Consent Decree, and as heretofore noted the other major distributors originally parties defendant in this suit have been dropped as such. The arbitration features have continued to remain in effect since the expiration period by agreement of the parties, and so far as the record discloses there has been no arbitration under this Decree of any clearances involved herein existing at any time. We are called upon in this suit to decide whether there were any violations by these defendants of the law as laid in the complaint. Paramount et al. are not parties here. The violations herein are alleged to have occurred prior to the date of the Consent Decree.

There is now no method by which either party can compel arbitration. The action taken in the adoption of the Consent Decree and the present availability of arbitration by agreement, however, do have a bearing on the extent of the judgment or decree to be made herein.

Some of the major companies are exhibitors as well as distributors. The government by the Consent Decree entered in an agreement setting up procedure purported to provide a fair and equitable sale, distribution and showing of pictures to all distributors. Just what was accomplished by the Decree, other than some arbitration of clearances, does not appear. The government in entering into the Consent Decree evidently contemplated that such decree would obviate the necessity of a trial of the issues and intended to let by-gones be by-gones. As compared with some of the major distributors, these defendants when combined are relatively small. The Consent Decree, therefore, brings up the question of whether the harsh determination of dissolution as urged by the government should be compelled or whether some adjustment or re-organization can be agreed on or fixed by the court which will as definitely as possible prevent future violations.

The motion picture business in production, distribution and exhibition has come to be a leading industry in this country. The producer-distributors and chains of exhibitors occupy positions from which "monopolization" is easily brought about. Each have lawful advantages which are sufficiently remunerative. The public, as well as the individual independent exhibitor, has an interest in fair competition, and it is entitled to have exhibitions at reasonable prices, well selected products and reasonable clearances between available theatres. A theatre owner naturally seeks to furnish those pictures which attract the greatest revenue. The record does not disclose any different attitude on the part of "Schine." The record does not disclose that it has not furnished sufficiently attractive entertainment. Fair competition should benefit the public, but "monopolization" when exercised by a strong wide-reaching organization or group of affiliated organizations crushes or weakens opposition, eliminates fair competition to the disadvantage of the public and the individual competitor.

The defendants have maintained an unlawful combination among themselves and with their affiliated corporations and have monopolized the licensing of the exhibition of motion picture films in various cities and towns in violation of the aforesaid sections of the Sherman Act and, through the unlawful combination between themselves and their affiliates by their predatory practices, have monopolized the business of operating motion picture theatres in various towns and have attempted to monopolize in various other towns; and the defendants have contracted, conspired and combined with each other and their affiliated corporations and with each of the aforesaid major film corporations for the purpose, and with the effect of suppressing competition and monopolizing exhibition of films distributed by each of said film corporations in various towns and cities, in violation of the aforesaid statute.

The plaintiff is entitled to a judgment enjoining the defendants:

(1) from monopolizing the supply of major first run films in any situation where there is a competing theatre suitable for first run exhibition thereof, and from monopolizing the supply of second run films in any situation where there is a suitable theatre for second run exhibitions thereof;

(2) from demanding or receiving clearance over theatres operated by others which unreasonably restrict their ability to compete with a theatre owned or operated by a defendant, or corporation controlled by it;

(3) from conditioning the licensing of films in any competitive situation, outside of Buffalo, New York, upon the licensing of films in any other situation;

(4) from selling or acquiring any theatre interests pending the further order of this Court;

(5) from enforcing any existing agreements heretofore entered into by the defendants not to compete, or to restrict the use of any real estate to non-theatrical purposes; from the use of any threats or deception as a means whereby a competitor is induced to sell;

(6) from continuing the heretofore described "conspiracy" or "monopolization" in restraint of trade and commerce between the states and the entering into any combination or conspiracy for the purpose or with the effect of restraining trade and commerce between the states;

(7) and directing the entering of a decree adjudging that the defendants and their affiliated corporations be dissolved, re-

242

aligned or reorganized in their ownership and control, so that fair competition between them and other theatres be restored and hereafter maintained; and that the determination of the question of the dissolution, re-alignment or reorganization of the parties aforesaid and the method to be employed in the accomplishment of the same be left to be fixed by this court after further consideration with the parties.

As to the objections of the defendants that certain testimony is hearsay, it is to be said this was received in evidence on the explicit statement of the attorneys for the government that the authority to make the statements and write the communications would be shown. The Court reserved the right to strike out in default of making of such connections. This connection has not been made in certain instances, and the court is attaching and submitting herewith a statement of its action with respect thereto. However, it is believed that the exclusion or inclusion of this testimony does not affect the decision on the issues.

 In the instant case voluminous records of the distributors were received in evidence on stipulation of the parties. These, among others, included many agreements made by the distributors with the defendants and others. Various inter-department communications to which objections were made were properly received as a part of the record of the distributors, and further many of them were made by officials acting in their ordinary and usual capacity as representatives of the distributors. Acceptance of this type of evidence is supported by many authorities. Murray v. United States, 7 Cir., 10 F.2d 409, certiorari denied 271 U.S. 673, 46 S.Ct. 486, 70 L.Ed. 1144; Lewis v. United States, 9 Cir., 38 F.2d 406; Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F.2d 53; Patterson v. United States, 6 Cir., 222 F. 599, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499; United States v. Corn Products Refining Co., D.C., 234 F. 964; Hartford Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373.

The parties herein have heretofore submitted lengthy proposed Findings of Fact and Conclusions of Law. It seems that it would simplify matters if, in the light of this opinion, new Findings were submitted. This seems specially advisable because of the numerous situations involved in the suit. However, this matter will be left to the desires of counsel.

 Acting upon the objections made by defendants, the following are stricken from the record:

Testimony by Long (R 127) that Granger, Fox general sales manager, told him that Fox could not afford to give up $50,000 worth of business in order to get $5,000.

Testimony by Dasher (R 352–353) that MGM branch manager Drew told him, "Schine has 60 theatres, you have got one. What do you expect us to do."

Testimony by Cohen (R 3201) that Seed, Warner exchange manager, told him that Schine would pay $25 more if Warner did not sell the independent.

Testimony by DeToto (R 808, 809) as to what Lehman said "Schine" was going to do in relation to opening additional theatres.

Testimony by Moore (R 383, 384) as to what "Schine" asked that Metro hold (product) for them.

Testimony by Ayres (R 2963–2970) relative to the showing of Metro picture "Gone With The Wind."

Testimony by Warne (R 2350–2355) relative to his being called before the Film Board of Trade by a representative of RKO for a violation of the National Recovery Act in selling "two for one" tickets.

While we have generally held in favor of inter-office communications or memoranda, certain of them are hearsay and are stricken out:

In exhibit 370: "Lynch claims that he does not want a second run policy to prevail at the second run opposition and has promises from other major companies that they will not sell second run" is stricken.

Exhibit 456 refers in part to the fact that the independent told the local branch manager that he might be forced to charge 10¢ balcony and 15¢ main floor at night in order to meet his competition, and that is stricken.

The part of exhibit 519 which refers to the opinion of the branch manager that conditions were "chaotic" is not evidence against "Schine."

Exhibits 163, 229, 542, 546 and 554 are not stricken but are strictly construed. We believe them to be within the authority of the distributor's agent to make such statements, being incident to their scope of authority.

 Objection was frequently made to the testimony by the independent that, when he requested product of the exhibitor, he was told that it had been sold to "Schine."

It is not felt that this is hearsay or beyond the scope of authority of the branch or district manager, or of the salesman. He knew that it was sold, and to whom. The statement that it was sold is admissible, and it is also admissible to state to whom it had been sold.