UNITED STATES of America, Petitioner-Appellee,

v.

J. Myer SCHINE et al., Respondents-Appellants.

No. 234, Docket 24722.

United States Court of Appeals Second Circuit.

Argued June 4, 1958.

Decided Oct. 20, 1958.

Certiorari Denied Jan. 12, 1959.

See 79 S.Ct. 318.

See also 16 F.R.D. 514; 125 F.Supp. 738; 126 F.Supp. 464.

Henry Geller, Atty., Dept. of Justice, Washington, D. C. (Victor R. Hansen, Asst. Atty. Gen., and Daniel M. Friedman and Lewis Bernstein, Attys., Dept. of Justice, Washington, D. C., and John O. Henderson, U. S. Atty., W.D.N.Y., Buffalo, N. Y., on the brief), for petitioner-appellee.

Frank G. Raichle, of Raichle, Tucker & Moore, Buffalo, N. Y. (James O. Moore, Jr., of Raichle, Tucker & Moore, Buffalo, N. Y., on the brief), for respondents-appellants.

Before CLARK, Chief Judge, and PICKETT and MOORE, Circuit Judges.

CLARK, Chief Judge.

This is an appeal from judgments of conviction of criminal contempt of the provisions of a consent decree entered in the court below on June 24, 1949, after a lengthy antitrust proceeding involving the Schine Circuit motion picture theatres. Appellant Schine Chain Theatres, Inc., its subsidiaries Schine Theatrical Co., Inc., Schine Lexington Corporation, Schine Enterprises Corporation, Schine Circuit, Inc., and Chesapeake Theatres Corporation (together known as Schine Circuit), and its principal officers J. Myer Schine and John A. May were all parties to the allegedly contemned decree. The remaining appellants, Hildemart Corporation, Darnell Theatres, Inc., Elmart Theatres, Inc., Howard M. Antevil (head of Schine Circuit's legal department), and Donald G. Schine (president of Darnell Theatres, Inc., vice-president and a director of Hildemart Corporation, and an employee of Schine Chain Theatres, Inc.) were not parties to the decree, but are alleged to have joined with the first named appellants in continuing the conspiracy there prohibited.

The original antitrust proceedings against Schine Circuit were commenced with a complaint filed August 7, 1939, charging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Judge Knight tried the case and found violations. United States v. Schine Chain Theatres, D.C.W.D.N.Y., 63 F.Supp. 229. The Supreme Court affirmed most of the findings, but reversed in part and remanded for further findings with respect to the district court's order for the divestiture of a large number of theatres. Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245. The proceedings eventually culminated in the consent decree of 1949 which ordered the defendants to dispose of all their interests in 39 specified theatre properties and enjoined them in certain other respects. The decree directed that not less than one-third of the required divestitures be accomplished by June 24, 1950, and not less than two-thirds by June 24, 1951. These requirements were extended by various consent orders and by a court order on January 22, 1952, *nunc pro tunc* December 17, 1951, which gave

the defendants until June 24, 1953, to complete divestiture. The latter order provided that at least one-third of the remaining theatres be disposed of by June 24, 1952, and at least two-thirds by December 24, 1952.

The United States instituted the present proceedings in 1954 by filing a petition for an order under 18 U.S.C. § 401 directing the respondents to show cause why they should not be held in criminal contempt for willfully violating the decree. On March 10, 1954, the district court issued an order to show cause. Trial was had before Judge Knight, who, however, died after the case was submitted to him, but before decision. The parties then stipulated that Judge Burke should hear the case on the evidence already submitted and upon additional evidence for the respondents and rebuttal evidence by the Government. This was done, and on December 27, 1956, the court filed its Findings of Fact and Conclusions of Law holding that the respondents had willfully violated the decree. On March 19, 1957, the court entered its judgment of conviction, and on March 26, 1957, it imposed fines totaling $73,000. These appeals followed.

The key charge in the Government's petition was that the first named group of respondents willfully disobeyed the divestiture provisions of the decree. The district court found that these respondents resisted the divestiture provisions by omitting certain theatres from their published advertisements and offers to sell, by ignoring and discouraging inquiries from brokers and prospective purchasers, and by refusing to provide prospective purchasers with theatre operating figures. All of these findings are amply supported by the evidence. While some of this evidence concerned the respondents' activities prior to the three-year period of the statute of limitations, it was properly admitted as relevant to the intent of the respondents concerning their then and later purported attempts to sell. Kansas City Star Co. v. United States, 8 Cir., 240 F.2d 643, certiorari denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.

Ed.2d 1438; 2 Wigmore on Evidence § 302 (3d Ed. 1940).

■ The chief defense urged at the trial to this charge was that during the three-year period immediately preceding the issuance of the order to show cause the movie industry so declined in profitable operations that no market existed for the sale of the theatres in question. The court found, however, that, although the market was depressed, it still existed; and this finding is supported by the Government's evidence of sales of similar theatres by other exhibitors during this same period. Respondents urge that the trial judge committed reversible error on this issue by refusing to allow their witness Berk, who was employed as their broker in the sale of these theatres, to testify in response to the question, "Was there a market for the sale or disposition of said theatres?" The error, if any, in excluding Berk's statement was harmless, for the statement called for was only conclusory and the witness had testified fully to the facts from which the conclusion could have been inferred.

In addition to disobeying the divestiture requirements, the court found the same respondents in contempt of specific injunctive provisions in (1) continuing illegal pooling arrangements in Fostoria, Ohio, (2) buying and booking pictures for theatres in which they had no financial interest, (3) acquiring interests in various theatres without court approval, (4) knowingly receiving discriminatory licensing conditions, and (5) continuing the original conspiracy in concert with the remaining respondents. Respondents attack the findings as to (1), (2), and (3) on the grounds that corporations independent of Schine Circuit carried out these activities and that they all occurred prior to the statutory period. But the evidence overwhelmingly supports the conclusion that the so-called independent corporations (Hildemart, Darnell, and Elmart) were actually owned and controlled by respondents and that, although the initial acts in contempt of the decree occurred prior to the statutory period,

the "illegal" conditions which they created continued up to the date of the order to show cause and resulted in what might be called "continuing contempts." Here, unlike Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115, where specific acts of misconduct were charged as contempts, or Pendergast v. United States, 317 U.S. 412, 419–420, 63 S.Ct. 268, 87 L.Ed. 368, where only such a charge was authorized by the applicable statute, it is the maintenance of conditions in violation of the decree which is the charge against the respondents. Cf. Bramblett v. United States, 97 U.S.App.D.C. 330, 231 F.2d 489, 493, certiorari denied 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874; McGregor v. United States, 4 Cir., 206 F.2d 583, 584; United States v. Franklin, 7 Cir., 188 F.2d 182, 187; United States v. Guertler, 2 Cir., 147 F.2d 796, 797, certiorari denied 325 U.S. 879, 65 S.Ct. 1553, 89 L.Ed. 1995.

■ Respondents contend that, while the consent decree enjoined them from directly buying and booking pictures for theatres in which they had no financial interest, it did not prevent them from using Darnell and Elmart to accomplish the same result. The bald statement of this contention is its own refutation. Respondents' suggested construction of the decree totally ignores its intent and purpose.

■ The district court appears to us to have erred in its ruling on charge (4) noted above. The charge is, however, of only minor importance, and the error does not justify upsetting the fines entered against the respondents. The lower court found that the respondents violated the injunction against knowingly receiving, in the licensing of films, discriminatory conditions not available to competitors in three respects: (a) by having a first opportunity to negotiate for all top pictures offered by every major distributor; (b) by licensing pictures under alternative licenses which were not available to all of Schine Circuit's competitors; and (c) by licensing pictures on a "test" or "terms later" basis which were not available on an equal basis to Schine Circuit's competitors. While respondents' conduct in (a) may violate the spirit of the decree, it seems to have been the only practicable way for them to insure their compliance with another section of the decree, the so-called Product Limitation Provision, which prohibited them from licensing for first-run exhibition more than specified percentages of major distributors' feature films. Since there is no evidence that respondents actively sought or insisted on the exclusive privilege of first negotiation as to the totality of any distributor's feature films, it follows that this particular competitive advantage did not violate the decree. Similarly evidence is lacking on key aspects of (b) and (c). There is no showing that Schine Circuit received "test" or "terms later" licenses except on the same films offered on that basis to other theatre operators. Although there is sufficient evidence to support a finding that Schine Circuit received alternative licenses permitting the exhibition of films in either an "A" or a "B" theatre and that these licenses were refused competing theatre operators, the record is bare of a showing of receipt by Schine Circuit of any such licenses within the period of the statute of limitations.

■■ The finding, however, that all of the respondents, both those who were parties to the original consent decree and those who were not, continued the original conspiracy is certainly justified by the evidence and is free from other attack. The evidence shows not isolated instances of violation, but a conscious and continuous scheme to thwart the court's decree. Respondents urge that the conspiracy charge here, in a criminal contempt proceeding, represents an unwarranted expansion of the use of the conspiracy charge. But the original consent decree specifically enjoined the defendants there "[f]rom continuing any contract, conspiracy, or combination with each other or with any other person which has the purpose or effect of maintaining the exhibition or theatre monopolies of the defendants." And while we

are mindful of the dangers inherent in unwarranted judicial extensions of the doctrine of conspiracy, see concurring opinion of Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 445–458, 69 S.Ct. 716, 93 L.Ed. 790, respondents in this proceeding in criminal contempt may not question the breadth of this portion of the decree. "[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." United States v. United Mine Workers of America, 330 U.S. 258, 293, 67 S.Ct. 677, 696, 91 L.Ed. 884. See also Worden v. Searls, 121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874.

The several other claims of error raised by respondents are all without merit. The Government's petition for an order to show cause adequately states "the essential facts constituting the criminal contempt charged" against Antevil and Donald G. Schine. F.R.Cr.P. 42(b). And any doubts these respondents may have entertained as to the specific nature of the charges against them were soon clarified by the Government's disclosures in its bill of particulars. While the wording of the conspiracy charge in the petition may deviate slightly from the wording of the section of the consent decree which enjoined the continuance of respondents' illegal conspiracy, there is no variance between the conspiracy charged in the petition and that proven before the lower court; and in this respect, also, the petition gave the respondents the notice required by F.R.Cr.P. 42(b). Respondents claim that the lower court in ruling during the heat of the trial that certain testimony was hearsay and inadmissible also ruled that Antevil was not authorized to act for Schine Circuit in reference to divesting certain theatres. But the question of Antevil's authority was not relevant to the evidentiary matter then before the court. And it is by no means clear that the court made any definitive ruling on the matter, since respondents' counsel withdrew his question. Moreover, Antevil's authority is so clearly and overwhelmingly established by testimony introduced after the disputed "ruling"— including that of Antevil himself—that we would be compelled to hold clearly erroneous a finding that he was not so authorized. Finally, there is not the slightest indication in the record that the respondents misconstrued the court's "ruling" and, relying on it, failed to introduce relevant evidence.

Respondents vigorously urge that the consent order of January 22, 1952, *nunc pro tunc* December 17, 1951, contained an implicit forgiveness of any contempts of the original decree and is *res judicata* against the Government in this action. The decree on its face accomplishes no more than to extend the time during which the respondents could make the necessary sales and still be in compliance with the decree. While such a decree may be reopened if through mistake, inadvertence, or fraud it does not fully correspond to the underlying agreement between the parties, until that is done the court's order is limited to the terms of the decree. Utah Power & Light Co. v. United States, 42 F.2d 304, 308–309, 70 Ct.Cl. 391. And, since the purpose of a proceeding in criminal contempt is to vindicate the authority of the court, Gompers v. Buck's Stove & Range Co., supra, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797, even if Justice Department officials entered into a private settlement agreement as respondents allege, such an agreement does not operate as a defense to this action. O'Malley v. United States, 8 Cir., 128 F.2d 676, 685, reversed on other grounds, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368.

The respondents have urged their points on this court with great force and sincerity. But we are constrained to say that the issues appear to us to be factual in nature, and Judge Burke's findings are in accord with the evidence.

Convictions affirmed.

MOORE, Circuit Judge (dissenting in part).

In my opinion this case presents important questions of law with respect to consent decrees in the antitrust field. In recent times many of such suits instituted by the government have been concluded by this type of decree. Frequently the decree vitally affects the conduct of the business of the defendants. But a corporation can only operate through its officers and employees who are responsible for its actions; so also the government. The term "consent" connotes acquiescence by the parties to certain conditions usually stated in a written document. Such documents, however, are not always immune from ambiguity. When this situation arises, how is it to be resolved? A decree is, in effect, a contract and should be so regarded. To resolve any ambiguity the same evidentiary principles applicable to contracts should apply. What effect, if any, can be given to the statements of the consent decree negotiators, i. e., the representatives of the government and of the defendants? Are all interpretations of the decree and the business decisions thereunder to be made in fear of conviction for criminal contempt if the question of compliance be close? The effect and scope of the consent decrees in this case raise these problems which must be determined in arriving at a just result.

To reduce the facts to the barest outline, the government, believing that the group referred to as the Schine defendants were willfully stifling competition by their business practices, instituted an antitrust proceeding against them in 1939. An appeal by the defendants [1] therein to the Supreme Court was partially successful (Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245). Although the government could have proceeded to a court decree, after protracted negotiations a consent decree, dated June 24, 1949, was signed bearing the signatures of counsel both for the defendants and the government. The decree provided for the elimination of many objectionable business practices but its main purpose was to secure divestiture of a large number of Schine theatres by providing that "the Schine defendants shall dispose of all of the interest of each or any of the defendants in the following properties to persons who will use them as motion picture theatres within three years from the date of the entry of this judgment." The defendants were further required to "entertain offers for the purchase of such theatres at any time." Disposition of one-third of the theatres had to be accomplished within one year and the balance within two years (Decree IV(A), June 24, 1949).

The decree expressly provided that if the defendants were "unable to sell on reasonable terms" they might apply for court permission to lease (Decree IV (B)). The trial court so interpreted the decree for he found that "The Schine defendants were entitled to obtain reasonable prices for the theatres required to be divested" (Finding No. 35).

Because of a rapid deterioration in the business of motion picture theatres (particularly the class B type in the small towns where the theatres to be divested were located) the defendants sought an extension of time for divestiture. In the meantime, and subsequent to the 1949 decree, the government had discovered various provisions which it desired to include in an amendment. Accordingly, after further negotiations and "it appearing to this Court [the District Court] that if the conditions hereinafter set forth are complied with, competition in Schine towns and the disposition of the theatres required to be disposed of will be facilitated" the time for disposition was extended to June 24, 1953, one-third of the then undisposed of balance by June 24, 1952, two-thirds by December 24, 1952. Certain directions were given, such as:

"2. Promptly after the entry of this order, defendants shall notify the public and real estate brokers that no reasonable offer will be refused for the theatres.

---

1. Unless otherwise stated "defendants" are the Schine defendants.

\* \* \* \* \* \*

"4. Schine shall not refuse any offer as unreasonable, if the offer, plus the profits of the particular theatre in question since June 24, 1951 would be considered a reasonable offer." Order, January 22, 1952.

Provisions permitting leasing "in the event that Schine is unable to sell on reasonable terms" were included (Order, January 22, 1952, par. 8). This order was consented to by the late Honorable Robert P. Patterson and Howard M. Antevil for the defendants, signed by Judge Knight and endorsed "Not objected to" by counsel for the government.

The defendants have been convicted of criminal contempt for willful violation of the terms of the decree and the amending order.

The majority opinion recognizes that "[T]he key charge in the Government's petition was that the first named group of respondents [i. e., the Shine defendants] willfully disobeyed the divestiture provisions of the decree."

The crucial findings on willful failure to divest (Findings 30–35), however, fail to differentiate between conduct occurring before entry of the order on January 22, 1952 extending the time of the defendants to divest and conduct occurring after that date, and, in my opinion, can be affirmed only by ignoring the existence and terms of the extension order. This extension order unequivocally lengthened the time of the defendants to dispose of their theatres to June 24, 1953. The defendants, as the government concedes, obtained this additional time only by consenting to certain amendments to the 1949 decree desired by the government.

The fact that any dispute over failure to divest prior to January 22, 1952 had been settled by the parties themselves was glossed over by the District Court with the statement that "The petitioner is not barred on any settlement theory from asserting, as a basis for criminal contempt, charges against the respondents for acts performed prior to January 22, 1952". Concl. of Law, No. 3. The government argues that "Finally, assuming *arguendo* the factual correctness of appellants' settlement theory, Government officials could not, by agreement with private parties, condone wilful violations of a judicial decree so as to bar the court from punishing such violations". Appellee's brief, p. 54. But what was settled? The government failed to call its representative, Marcus, who participated in the negotiations and who placed the only government signature on the order. Yet by the time of the January 22, 1952 order the factors which created the divestiture difficulties must have been either known to the government or capable of ascertainment upon inquiry. Certainly if failure to divest were due to "omitting certain divestiture theatres from their published advertisements and offers to sell" or to obstructing and discouraging "the efforts of prospective purchasers and brokers to negotiate for theatres" or by preventing "any determination of market value by withholding theatre operating figures from prospective purchasers" (Finding of Fact, No. 24), the government was, or could have become, aware of this situation and insisted upon curative provisions in the January 22, 1952 order. Paragraphs 2 and 4 of the order by their wording give rise to the inference, if not a reasonable certainty, that these matters were discussed before the terms of the order were acceptable. With knowledge of failure to list properties, discouragement of purchasers and withholding of operating figures, the government was still willing to have divestiture accomplished by notification to the public and real estate brokers "that no reasonable offer will be refused" and only demanded that profits since June 24, 1951 be taken into consideration in determining reasonableness. In the light of such an order there is no basis for a contempt conviction premised upon acts alleged to have been violations prior to January 22, 1952.

Agreements to extend time are probably the most commonplace stipulations

in all types of litigation. Here the parties, rather than quarreling in open court on the merits for an extension of time, chose to negotiate. These negotiations resulted in an agreement. The government, even as any other litigant, should be held to its agreements in the antitrust field, otherwise the consent decree becomes a completely unilateral document.

Not only does the disregard of the 1952 extension order require reversal on the divestiture findings, but the findings themselves are not supported by the evidence. Thus, for example, there is no proof that the defendants did not comply with the conditions specified in paragraphs 2 and 4 of the order of January 22, 1952. It is highly significant that the government did not offer any proof, and there is no finding, that the Schine defendants rejected any reasonable offer for a theatre. Had this been true, certainly during the period prior to the agreement resulting in the order of January 22, 1952 the government would have been aware of such a situation. It would have been very simple to incorporate in the original decree or the amendment a provision that divestiture had to be achieved regardless of a reasonable price. In fact, but for the possibility of unlawful taking of property and lack of "due process," the decree might have required the Schine defendants to give away or board up their theatres. However, it did not so provide. Nor could the government by judicial fiat create a buyer who would compete with the remaining Schine theatres if the economic status of the industry would not justify such a purchase.

The majority opinion proceeds quite correctly on the theory that the failure to divest can constitute a contempt only if a market existed for the theatres ordered to be sold. But then it is forced to sustain the District Court's undocument-ed finding (Finding 32) that the market was "depressed" but "did not disappear" by resort to the erroneous assumption that it "is supported by the Government's evidence of sales of similar theatres by other exhibitors during this same period." [2]

If there be any principle of law which can be regarded as fundamental it is that every parcel of real property differs from every other. This is the concept behind the doctrine of specific performance of real estate contracts. Therefore, proof of sales by other motion picture exhibition companies of theatres in other cities where the type of theatre was different, and the circumstances of the sale unknown, is wholly insufficient to base a finding that "There was in fact a market for such [of the to-be-divested Schine] type theatres" (Finding 32).

The only evidence offiered to show that a market existed for the Schine theatres was that in the period from 1951 to 1954 sales of movie houses were effected by three nationwide exhibitors, Loew's Theatres, American Broadcasting-Paramount Theatres, and Stanley Warner Corporation. Although all but one of the Schine theatres required to be sold were "B" or inferior houses located in small towns, the government not only failed to show what number, if any, of the theatres sold in 1951–1954 by these three giants of the exhibition industry were "B" houses in comparable towns, but it successfully blocked attempts by the defendants to elicit this fact. However, many, if not most, of the houses owned by these three exhibitors were top-flight properties. Therefore, this evidence, the sole basis for establishing the market for the Schine "B" houses, while perhaps not entirely irrelevant, hardly can be said to prove the proposition beyond a reasonable doubt. [3]

During the only period upon which a contempt for failure to divest can be

---

2. As to the review of the findings made by the District Court, the "clearly erroneous" doctrine applies less vigorously here than in those cases which were actually tried before the judge who made the findings. Deep Sea Tankers, Limited v. The Long Branch, 2 Cir., 1958, 258 F.2d 757.

3. It is significant that the government proposed no findings concerning the existence of a market for the theatres nor any

based, viz., June 24, 1952 to March 10, 1954, the four-wall movie exhibition business was wallowing at the bottom of a severe depression. Each of the three nationwide exhibitors whom the government used to prove a supposed market for the Schine properties obtained numerous extensions on their own divestiture schedules. The "B" movie houses in small towns had to face the competition of drive-ins as well as television and were, therefore, the most vulnerable. Most of these houses, including those of the Schine chain, were losing money during this period and literally hundreds were going out of business. When this state of financial chaos is contrasted with the then generally prosperous economic conditions, the finding that a market existed for the Schine "B" houses, is unrealistic.

In my opinion, the District Court also erred in holding the individuals, Howard Antevil and Donald Schine, and the corporation, Darnell, in contempt for conspiring with the defendants to monopolize and restrain trade in the exhibition business. These two individuals and Darnell were not named as defendants in the original civil action and the consent judgment entered in the cause in 1949 did not purport to, and in fact could not, bind them. An injunctive decree does not operate *in rem* but *in personam* and does not bind the whole world. Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661. Therefore the District Court's conclusion of law (Concl. 4) that "The judgment of this court in Civil Action No. 223 was binding upon respondents * * * Donald G. Schine, Howard M. Antevil, * * * Darnell Theatres, Inc. * * * at all times from June 24, 1949 through March 10, 1954" is erroneous.

Nor unlike the corporations, Hildemart and Elmart, can the claim be sustained that Darnell was in reality the alter ego of the Schine brothers. Darnell was formed in 1947—long before the 1949

decree was entered against the defendants. The government concedes (Appellee's brief, p. 19) that it had knowledge of Darnell's relationship to the defendants and the business in which it was engaged. After the entry of the decree, neither the relationship nor the business was changed. It cannot be said that Darnell was formed as an instrumentality for evading the decree as was the case in Walling v. James V. Reuter, Inc., 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001, or Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718. That the defendants were not to consider Darnell "as opposition for the purposes of the decree" (Appellee's brief, p. 20), i. e., could not sell theatres to it, does not alter Darnell's status as a non-party. The attack on Darnell is simply another instance of the government's seeking to rewrite the consent decree which it made with the defendants.

The only way in which Antevil, Donald Schine and Darnell can be held in contempt is to be adjudged to have aided and abetted the defendants in violating specific provisions of the decree. This concept, however, is to be used with the utmost restraint. As Judge Learned Hand noted in reversing a contempt conviction of a person not named as a party:

"It is by ignoring such procedural limitations that the injunction of a court of equity may by slow steps be made to realize the worst fears of those who are jealous of its prerogative." Alemite Mfg. Corp. v. Staff, 2 Cir., 1930, 42 F.2d 832, 833.

The principal basis for holding these three non-parties in contempt was Paragraph 16, Section II A of the decree which prohibits the defendants:

"From continuing any contract, conspiracy, or combination with each other or with any other person which has the purpose or effect of maintaining the exhibition or thea-

---

other findings on the willful failure to divest. Apparently it considered its chances on this issue virtually hopeless

and elected to rely on the more pervasive charge of conspiracy.

tre monopolies of the defendants or of preventing any other theatre or exhibitor from competing with the defendants or any of them, and from entering into any similar contract, conspiracy, or combination for the purpose or with the effect of restraining or monopolizing trade and commerce between the States."

This provision is merely a sweeping prohibition against the defendants from engaging in any Sherman Act conspiracy. The fact that it is valid as to the defendants should not enable the government to twist the provision into a device for regulating the general business activities of persons not parties to the decree. It may be that Antevil, Donald Schine and Darnell have violated the criminal provisions of the Sherman Act. If so, they are entitled to their day in court to contest the merits of their own case. They should not be forced to defend their alleged antitrust violations under the guise of contemning a decree entered against other persons.

These non-parties (except Antevil, as counsel) did not participate in fashioning the terms of the consent decree, received no benefits from it, and can be held to have contemned it only by the traditional application of equitable principles. They do not come within the dragnet of a sweeping injunction to obey the law entered against other persons.

Applying this principle to the government's petition, the only conspiracy in which Antevil, Donald Schine and Darnell can be held in contempt for aiding and abetting the defendants is the same one which was the subject of the original action and which was proved therein. Regardless of the conspiracy proved in the contempt action, the District Court's decision makes it impossible to find that it was the original conspiracy. Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245, plainly shows that circuit buying power was the crux of the conspiracy to monopolize and restrain trade. Yet the District Court apparently was of the opinion that the decree had eliminated this major evil of circuit buying power because it did not

find, as the government charged, that the defendants violated the provisions of the decree enjoining block booking, combining open and closed towns in buying film, and making master agreements. In any event, this court has eliminated all doubts as to the continuation of circuit buying power by holding the defendants not to have contemned the ban against receiving discriminatory film licensing conditions. Since the original conspiracy no longer existed, it was impossible to hold Antevil, Donald Schine and Darnell in contempt for participating in it.

I would, however, affirm the conclusions that the defendants contemned the decree by acquiring interests in theatres without court approval, by buying and booking pictures for theatres not owned by them, and by continuing the Fostoria pool. Elmart, a wholly-owned subsidiary of Hildemart (whose stock was owned by the Schine brothers and their wives in trust for their children), was the principal instrumentality for perpetrating these contempts. Since the Schine brothers had complete and unchallengeable control of Elmart, the transfer in 1952 by Darnell of its theatres to Schine Jefferson Corporation, whose name had just been changed to Elmart, was a clear violation of the provision of the decree forbidding the defendants "from acquiring any financial or operating interest in any additional theatres except after an affirmative showing that such acquisition will not unreasonably restrain competition." The use of Elmart to buy and book film for the Isaac theatres was likewise a flimsily disguised flaunting of the decree. Finding 22 describes how the prohibition against maintaining the defendants' interest in the Fostoria pool was circumvented by the substitution of, first, Darnell and, then, Elmart for the Schine Circuit. The facts set forth in this finding, including the misrepresentations made to the District Court in affidavits by John A. May and Antevil, are virtually undisputed. Donald Schine, Antevil, Darnell, Hildemart and Elmart aided and abetted the defendants in violating the aforementioned provisions of the decree and should be held accountable for their conduct.

The defendants used family corporations to evade the restrictions to which they had voluntarily consented and subjected themselves. The employment of the corporate form neither avoids violation of the letter of the decree nor the spirit and purpose behind it. Antevil, in place of using his position as a member of the Bar to obtain compliance with the decree, as an employee became a guiding hand in Schine's intra-family machinations to disobey it. While Donald Schine's youth and natural tendency to honor his father's wishes may mitigate his misconduct, it cannot cure the contempt since, as the court below found, he had actual knowledge of the decree and joined at his peril the various schemes to contemn it.

Since the conclusions on the failure to divest and the conspiracy to restrain and monopolize trade by those respondents not named in the civil action are unsupported, and since proof should have been taken as to the matters embraced in and compromised by the order of January 22, 1952, I would remand for further findings and resentencing in accordance with the procedure outlined in Yates v. United States, 355 U.S. 66, 75–76, 78 S.Ct. 128, 2 L.Ed.2d 95, and Nilva v. United States, 352 U.S. 385, 396, 77 S.Ct. 431, 1 L.Ed.2d 415.