**UNITED STATES of America, Plaintiff,**

v.

**PAPERCRAFT CORPORATION, a Pennsylvania Corporation, Defendant.**

**Civ. A. No. 74–816.**

United States District Court, W. D. Pennsylvania.

May 9, 1975.

Thomas S. Brett, U. S. Dept. of Justice, Ronald B. Rowe, F. T. C., Washington, D. C., David Atkins, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

In this proceeding for violations of a Federal Trade Commission (FTC) Order requiring Papercraft Corporation (Papercraft) to divest itself of CPS Indus-

tries, Inc. (CPS), the Government seeks the maximum penalty of $10,000 per day and a mandatory injunction directing compliance. On March 11, 1975, this Court by Opinion and Order granted the Government's Motion for Partial Summary Judgment, finding Papercraft to be in default of the Divestiture Order. A lengthy history was there given which will not be repeated except as here required for clear understanding.

Proceedings for divestiture were initiated by the FTC on April 10, 1969, alleging illegal acquisition of CPS by Papercraft in December of 1967. FTC's initial Order requiring divestiture was issued June 30, 1971. On June 6, 1973, a Modified Order was entered in compliance with the unappealed Mandate of the Seventh Circuit Court of Appeals.[1] The Modified Order required Papercraft, within six months of the date thereof, to "divest, absolutely and in good faith, subject to the approval of the Federal Trade Commission, all assets, properties, rights and privileges, . . . of CPS Industries, Inc., . . .". None of the assets were permitted to be transferred to any person who was an officer, director or employee of Papercraft or affiliated corporations, or who controlled more than 1% of the shares of Papercraft Corporation, or to anyone who was not approved in advance by the FTC. However, it was provided that Papercraft could divest itself without the preceding limitations being applicable, if such divestiture was accomplished through a new corporation whose shares could be distributed to the stockholders of Papercraft in proportion to their holdings of Papercraft stock. For a period of ten years, Papercraft was ordered not to acquire, in whole or in part, stock or assets of any concern engaged in the manufacture, production, sale or distribution of any decorative gift wrap product.

Papercraft twice requested extensions of the FTC Order which were rejected, and on August 6, 1974, the FTC, pursuant to Section 16 of the Federal Trade Commission Act, 15 U.S.C. § 56, certified the proceedings to the Attorney General of the United States setting forth that Papercraft had neither divested itself of CPS nor presented to the FTC any plan for divestiture of CPS by sale or spinoff.

Papercraft in this Court unsuccessfully asserted error of the FTC in denying requests for extension, and rather obliquely challenged the FTC's certification to the Attorney General. This Court entered Summary Judgment on the Order violation. A rather lengthy hearing was held by this Court on the imposition of civil penalties and the framing of a mandatory injunction to prevent continuation of the violation of the FTC Divestiture Order.

## NON–COMPLIANCE

The Government's suit was brought under both the Federal Trade Commission Act and the Clayton Act. Section 5(*l*) of the Federal Trade Commission Act (15 U.S.C. § 45(*l*),[2] autho-

1. Papercraft Corporation v. F.T.C., 472 F.2d 927 (7th Cir. 1973) modified the FTC's Order only in minor matters. It deleted ¶ IX, which reads as follows:

"IT IS FURTHER ORDERED that for a period of three (3) years from the date of divestiture The Papercraft Corporation is prohibited from selling any decorative gift wrap products to any customer account which at any time has been sold any decorative gift wrap products by CPS Industries, Inc., unless such customer account was sold such decorative gift wrap products by The Papercraft Corporation prior to December 27, 1967."

The Cease and Desist Order as modified was enforced.

2. 15 U.S.C. § 45(*l*) provided, prior to amendment:

"Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of such an order shall be a

rized a penalty of not more than $5,000 for each violation. Under Section 11(*l*) of the Clayton Act (15 U.S.C. § 21(*l*)),[3] a penalty of not more than $5,000 for each violation was established. The maximum penalty for violation of Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), has since been increased from $5,000 to $10,000. *See,* Pub.L. 93–153, Title IV, § 408(c), 87 Stat. 591, 592 (1973). These statutes must be read *in pari materia.* Federal Trade Com. v. Cement Institute, 333 U.S. 683, 690, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Federal Trade Commission v. Reed, 243 F.2d 308 (7th Cir. 1957). Thus, maximum penalties of $10,000 per day are available as contended for by the Government.[4]

Congress, as evidenced by the legislative history, was fully cognizant of the problem before the Court of determining sufficient monetary penalties to provide incentive for prompt compliance with FTC Orders. Thus, in recommending passage of the 1959 Amendment to the Clayton Act, to bring it into accord with the 1938 Wheeler-Lee Amendment to the Federal Trade Commission Act, the House Committee on the Judiciary observed:

"... Although the maximum penalty may be severe, in certain cases it would be appropriate. In the absence of the maximum penalty for a continuing offense, for example, commission and board orders with respect to mergers and interlocking directorships would be ineffective."

The House further went on to add that:

"... In such cases, unless the maximum penalty applied and each day of a continuing violation considered a separate offense, an order dissolving an unlawful merger could be ignored after the mere payment of a $5,000 fine."

(House Report No. 580, 86th Congress, First Session, U.S.Code, Congressional and Administrative News, pp. 1804, 1807 (1959)).

The United States Supreme Court in United States v. ITT Continental Baking Co., 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed. 2d 148 (1975), in the same context stated as follows (at p. 231, 95 S.Ct. at p. 932, 43 L.Ed.2d at p. 158):

"The legislative history also makes clear that Congress was concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators of FTC orders as nothing more than an acceptable cost of violation, rather than as a deterrence to violation. ..."

One of the clearest expositions of the court's approach to civil penalties was

---

separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense."

3. 15 U.S.C. § 21(*l*) provides:

"Any person who violates any order issued by the commission or board under subsection (b) of this section after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of any such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of

the commission or board each day of continuance of such failure or neglect shall be deemed a separate offense."

4. As noted in United States v. ITT Continental Baking Co., 420 U.S. 223, 231, 95 S.Ct. 926, 931, 43 L.Ed.2d 148, 157 (1975), in footnote 6:

"... [T]he District Court has discretion to determine the amount of the penalty for each violation whether the transactions are construed as single or as continuing violations. Thus, while totalling the penalty as a series of daily violations rather than as a single violation could raise substantially the total penalty assessed, the statutory scheme does not require that result, and the trial judge's determination would prevail in the absence of an abuse of discretion."

given by Judge Lay in United States v. Beatrice Foods Co., 493 F.2d 1259 (8th Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1350, 43 L.Ed.2d 438, where the following appears in a factual situation very close to ours (at pp. 1270–1271):

". . . As the government persuasively urges here:

'For competitive purposes there is nothing intrinsically wrong with the "act of acquisition" in and of itself. *Rather it is the effect of an acquisition, the relationship it creates which may lead to its proscription.* . . . The order's express and agreed terms barred further "acquisitions" and that term plainly had the same meaning as in Section 7 of the Clayton Act. The anti-competitive effects of acquisitions condemned by Section 7 come from the fact that, by holding the assets, the acquiring firm changes the competitive structure of the industry involved. It is the permanent effect of prohibited acquisitions which Congress sought to remedy in the statute. . . . [Any other interpretation] *would convert all orders barring future acquisitions into minor expenses of any acquisition or merger, for the prohibition could be avoided by payment of a $5,000 penalty.* (emphasis added)'

In Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir. 1969), *Cert. denied,* 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 689 (1971), the court reasoned:

'Here the very acquisition and position of potential control which was found violative of the Clayton Act as of 1949 continued through 1961. *We need not dispute the statement of the district court that, in the ordinary antitrust case, there is no "presumption of continuance of unlawful conduct." Here, however, what was unlawful was du Pont's status as stockholder in General Motors, and that status continued until divestiture.'*

*Id.* at 965 (emphasis added).

Similarly, in United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the defendants argued that where the challenged stock acquisition occurred in 1917, the government could not bring suit in 1949 to undo the acquisition since § 7 was applicable only to the acquisition and not to the subsequent holding of the stock. The Supreme Court rejected this argument:

'We repeat, that the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints. . . . *The fire that was kindled in 1917 continues to smolder.'*

*Id.* at 607, 77 S.Ct. at 884 (emphasis added).

In United States v. Schine, 260 F.2d 552 (2d Cir. 1958), *cert. denied,* 358 U.S. 934, 79 S.Ct. 318, 3 L.Ed.2d 306 (1959), the defendants were found to have violated an antitrust decree by acquiring interests in theaters without prior court approval. The defendants tried to argue that the statute of limitations on these acquisitions had run; however, the court held:

'[A]lthough the initial acts in contempt of the decree occurred prior to the statutory period, the "illegal" conditions which they created continued up to the date of the order to show cause and resulted in what might be called "continuing contempts." '

*Id.* at 555–556." [Footnote omitted]

In United States v. J. B. Williams Company, Inc., 498 F.2d 414 (2d Cir. 1974), Judge Friendly had the following to say (at pp. 438–439):

"While there appears to be no authority on the point, we would think it

desirable that the court accord an evidentiary hearing on the amount of the penalty if this is reasonably and seasonably requested either by the defendants or by the Government. As the court below recognized, the size of the penalty should be based on a number of factors including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay. 354 F.Supp. [521] at 548. *See* United States v. Universal Wool Batting Corp., 1961 Trade Cases ¶ 70, 168 (S.D.N.Y.1961); United States v. Vitasafe Corp., 212 F.Supp. 397 (S.D.N.Y.1962); United States v. Wilson Chemical Co., 1962 Trade Cases ¶ 70, 478 (W.D.Pa.1962), *aff'd,* 319 F.2d 133 (3 Cir. 1963); United States v. H. M. Prince Textiles, Inc., 262 F. Supp. 383, 389 (S.D.N.Y.1966); United States v. Bostic, *supra,* 336 F.Supp. [1312] at 1321. . . ."

■ We agree with the Government's basic position that the penalties must be sufficient to: (1) eliminate the benefit which Papercraft has had through its failure to divest CPS; (2) compel it to divest; and, (3) create a deterrent to further delay in compliance, so that others will not choose a like course in the future. The penalties must be sufficient to eliminate "an acceptable cost of violation". United States v. ITT Continental Baking Co., *supra.*

## THE PENALTIES

### I. THE EVIDENCE OF GOOD FAITH

The Government contends the evidence shows Papercraft never seriously considered the alternative forms of divestiture available to it under the FTC Order, but only sought a sale transaction at an *unreasonably high price.* They point to the fact that Papercraft set a sale price of $37,500,000 for CPS, which was almost seven times the 1967 acquisition price of $5,706,000,[5] and approximately twenty times CPS' 1974 earnings of $1,992,294. The Government further points out that this price was set in an effort to make a good sale for Papercraft shareholders, and was maintained for an unreasonable period of time, in total disregard of the FTC Order requiring unconditional divestiture of CPS not later than December 16, 1973.

Papercraft, to the contrary, takes the position that it exercised good faith and due care in attempting to effectuate compliance. It points out that following the issuance of the decision of the Court of Appeals for the Seventh Circuit on January 25, 1973, Papercraft considered the possibility of filing a petition for certiorari to the United States Supreme Court but also, at the same time, considered plans to effect the divestiture of CPS. By late March or early April of 1973, Papercraft's management had decided not to file a petition for certiorari, and immediately began actively to originate plans to sell CPS. Within a short time, Papercraft employed Blyth Eastman Dillon (BED), its investment banker with experience in this field, as *exclusive* agent to assist in divestiture under the two options which it considered to be available to it to achieve full compliance: (1) Papercraft could sell either the stock or assets of CPS to another company in exchange for stock, cash or notes, or a combination thereof; or (2) CPS could be reestablished as an independent company by the spinoff of CPS stock to Papercraft stockholders, or the sale of CPS stock to the public, or an offer to exchange CPS stock for outstanding Papercraft stock. Papercraft contends the first option was the only realistic choice "either from the point of view of financial benefit to Papercraft's stockholders or for the maintenance of

---

5. Papercraft paid for CPS with 285,300 shares of Papercraft stock valued for the purposes of the transaction at $20 per share.

CPS as a viable economic competitor." (Papercraft's Trial Brief at p. 12).[6]

Papercraft, in consultation with BED, concluded, after consideration of such factors as historic price-earnings ratios of Papercraft stock, the price-earnings ratios of comparable consumer-oriented companies, general market conditions and interest rates, and the projected profitability of CPS, that an asking price of $37,500,000 was justified. BED seemed not to have played a major role in the final price determination. Despite preparation of a confidential report on CPS, and a rather wide circulation of that report by BED, early reaction to this price was not favorable. For example, Allen H. Seed III of The Gillette Company "concluded that . . . [CPS] wouldn't be of interest to us at anywhere near the price level contemplated." Dan Rodgers, Chairman of John F. Murray Advertising Agency, Inc., stated on behalf of American Home Products Company, that the "asking price is substantially above anything we could consider." E. J. Sullivan of Borden, Inc. reportedly discussed an initial offer on a cash basis of $20,000,000. Kraftco, through an intermediary, indicated that they would be willing to consider a price of $25,500,000.

By September 12, 1973, the FTC staff was communicating with Papercraft, noting that "some prospective acquirers considered the asking price for the property to be divested to be too high. In this connection, you are reminded that

the obligation to divest which the Commission's order imposes, is paramount to any consideration of price." (Govt. Exhibit 25, Letter of Lawrence E. Gray, attorney for the FTC). And again, on October 24, 1973, after continued generation of negative responses, Attorney Gray wrote Papercraft's attorneys about its excessive price. (Govt. Exhibit 27).

On December 19, 1973, FTC attorney Wayne Kaplan wrote to Papercraft's attorneys addressing the rigidity of Papercraft's price and stated "we believe the record shows that respondent's continued adherence to the $37.5 million asking price has deterred prospects from further interest in CPS at a lower price level." (Govt. Exhibit 33). When Papercraft was unable to secure favorable response to its request for additional time from the FTC by letter-petition dated December 3, 1973, it effected certain changes early in January 1974 in its procedures for divestiture. It (1) appointed a Divestiture Committee, composed of outside directors and Papercraft's Chairman of the Board, to monitor closely the efforts to divest CPS, and (2) it reduced the asking price to $29,000,000 (which was still more than five times the price paid by Papercraft in 1967).

It is noted that at this time the *exclusive* brokerage arrangement with BED was terminated; four additional banking firms were approached to assist divestiture; Papercraft circulated the confidential report to the acquisition de-

---

6. Papercraft argued in its Trial Brief that *the second option was not feasible for many reasons*, including:
   "(a) There is serious doubt that CPS would remain a successful viable concern as an independent entity, as evidenced by its declining condition prior to acquisition by Papercraft. In particular, it would lack the strong upper eschelon management group which was available to it through Papercraft and the additional financial resources which Papercraft was able to provide from time to time.
   (b) There would be little or no market for the sale of CPS stock by the public generally. If the stock was spun off to stockhold-

ers of Papercraft, the FTC Order requires that the substantial block obtained by the Katz family be sold within six months. The existence of so large a block of stock in an untried company would further depress whatever public market existed for CPS stock.
   (c) Aside from the monetary interests of Papercraft and its stockholders, re-establishing CPS as an independent company would be contrary to the basic purposes sought to be achieved by the FTC, since a weakened and ineffective CPS would not be a strong competitor in the gift wrap field." [footnote omitted].

partments of eight major accounting firms eliciting the interest of their clients in purchasing CPS; and in response to the specific urging of the FTC, Papercraft advertised CPS in the Wall Street Journal and the New York Times. (The FTC is particularly critical of Papercraft's failure to advertise in these highly respected papers long before January of 1974). Following placement of the advertisements, Papercraft and BED received many inquiries, and more than a passing interest was indicated by such companies as American Can Company, American Home Products, Borden, Inc., Swingline Division of American Brands, Ward Foods, Inc., Minnesota Mining and Manufacturing Company, Dart Industries, Inc., Avery Products, Revlon, Inc., Wyomissing Corporation, and Franklin Mint.

Papercraft contined to receive numerous indications that its asking price of $29,000,000 was regarded as being too high. C. A. Nelson, Vice President of Dart Industries, Inc., wrote Papercraft on March 6, 1974, that "it is difficult from our point of view to justify a value anywhere near that indicated by you." (Deft. Exhibit AA). Minnesota Mining and Manufacturing Company stated on March 12, 1974, that "we would have no real interest in the acquisition unless the price were considerably less than half of the asking price." (Deft. Exhibit CC). William D. Walsh of Arcata National wrote on March 26, 1974, that Arcata proposed a valuing of CPS in the range of $12 to $12.5 million which was "close to 7 times 1973 earnings and at about $5,000,000 over . . . the company's book value. Given current market conditions which find most U.S. companies—including Arcata—selling at multiples of 5 and 6, we believe this is an equitable and realistic valuation." (Deft. Exhibit X). On May 14, 1974, Thomas H. Saliba of Arthur D. Little, Inc., wrote that "I do have difficulty in understanding the 'asking price' when the book value of the parent Papercraft is approximately $32.8 million

and the market value is roughly $30 million." (Govt. Exhibit CR. 11 at 1988). The evidence is thus clear that Papercraft must have been aware that even its $29,000,000 asking price was clearly unreasonable.

In addition, the FTC's staff continued to point out to Papercraft the fallacy of maintaining a high sale price, stating "although the reduction in price was a forward step, nevertheless it may be necessary for respondent to accept an even lower price in order to accomplish a divestiture of CPS without further undue delay." (Govt. Exhibit 34, Letter of March 1, 1974 from FTC staff attorney).

During this period of time and in order to demonstrate that the fair market value of CPS assets was in excess of the book value, Papercraft engaged Industrial Appraisal Company in Pittsburgh, one of the country's large appraisal firms, to determine market value. In September of 1974, Industrial Appraisal Company found the appraised value of the assets was $14,993,000.

We now come to the Arcata offer. Considerable negotiations were carried on throughout 1974, and in November of 1974 an offer of $13,000,000 was made, payable in large part with preferred stock at the rate of 8%. This offer was, of course, in the face of a sales demand price of $29,000,000, and Papercraft rejected the offer. Finally, in February of 1975, Papercraft lowered its asking price to $20,000,000. On March 31, 1975, Arcata made Papercraft an offer to purchase the stock of CPS for a net amount of $14.1 million, after forgiveness of $2.9 million owed Papercraft by CPS. At the time of the hearing in this proceeding on April 7, 1975, a letter of intent had been delivered comtemplating a definitive purchase agreement by May 1st. This has not, however, been accomplished.

During the years 1968 through 1974, Papercraft has reported total net income from CPS of $10,811,000 and during this same period Papercraft has received

dividends from CPS totaling $5,721,000. In the period of violation, since December 16, 1973 when divestiture was required by the Order, Papercraft has benefitted in excess of $2,500,000 or approximately $5,000 a day, based upon CPS' 1974 earnings.

John Kelsey, Vice President of BED, testified that the profit history of CPS was as follows: 1968–$842,000; 1969–$1,416,000; 1970–$1,406,000; 1971–$1,549,000; 1972–$1,739,000. [See also Deft. Exhibit A at p. 14]. In his opinion, the $37.5 million was "an appropriate price" even though it was more than twenty times earnings; even though the price of Papercraft stock, for example, on May 1, 1973 was $14—a price-earnings ratio of 8 to 1; even though any owner of CPS after divestiture would have to know that they would be in direct competition with Papercraft, who would vigorously compete in the gift wrap business. It is worth noting in passing that in 1972, 31.6% of Papercraft's profits came from CPS ($1.707 million out of a total $5.391 million).

One difficulty here is that after having agreed to a price of $37.5 million, no realistic effort was ever made by BED to weigh the market reaction to this price. All decisions thereafter were made by Papercraft, not based on the primary consideration of the illegal acquisition of CPS in 1967 or the Order to divest by December 16, 1973, but upon an attempt to get the highest possible sales price. Even in the face of continued market resistance to the asking price, no real effort was made to determine the validity of that asking price until the recent negotiation with Arcata at the $17 million figure.

Mr. Kelsey openly admitted that he wore "two hats" in the performance of his duties. As the representative of BED, he felt an obligation to the shareholders to get a "fair price" and at the same time, trying to face up to the responsibility to divest. Nowhere does he explain any reaction by Papercraft to the failure of the market to indicate interest at the $37.5 million mark, at the $29 million mark, or at any figure anywhere near thereto.

Howard Clark, First Vice President of BED, testified the $37.5 million asking price was "fair" and told of the hopeful negotiations which had been carried out with Swingline, Inc., only to receive notice in December of 1973 that CPS did not fit in with Swingline's plans. He denied that the asking price was of major concern to Swingline. On cross-examination, Clark admitted that the asking price for CPS was set by Papercraft's management and that the Kraftco offer of $25 million was not followed up by Papercraft. He admitted he had never read the FTC Opinion, nor at any place in his testimony did he indicate any understanding of the urgency of the Order to divest.

Joseph Katz, Chairman of the Board and President of Papercraft, told of stabilizing CPS' earnings after taxes through modernization of plant and various other cost saving devices whereby the earnings were as testified to by Kelsey. However, he added these approximations: 1973—$1,850,000; 1974—$2,002,000—a ratio of 10% of total sales after taxes and 20% before taxes.

Mr. Katz admitted that a sales price was developed at $37.5 million by Papercraft management, and then the investment banker was selected, whose analysis served to confirm the $37.5 million price. He acknowledged receipt of information concerning Kraftco's $25.5 million offer, to which he replied on May 18, 1973 that the price was too low.

In October of 1973, American Brands was interested enough to visit CPS in Tennessee, and was quoted the "asking price" of $37.5 million. Even though further contacts were made in November and December, and there was a final rejection by American Brands, Joseph Katz would have this Court believe that the price had no effect on these considerations.

Mr. Katz spoke of the Borden situation where a cash offer of $20 million

was apparently made, which was not brought to his attention. In March of 1974, when Arcata originally contacted BED and gave "our concept of values" in the range of $12 to $12.5 million, Katz admitted he did not consider this a viable offer, but simply a "fishing expedition", and told BED no such price could be accepted. On cross-examination, Mr. Katz acknowledged price-earning ratios of various companies as follows: Beatrice Foods, 17 to 1; Clark, 17 to 1; Kraftco, 13 to 1; Liggett & Myers, 12 to 1; Norton-Simon, 17 to 1. He also acknowledged that as early as December of 1973, he was aware that the asking price based on the price-earnings ratio of 20 to 1 was too high, particularly in light of the fact that by September of 1973, no one had offered anything near the price. Even when the Arcata offer was made at $12 to $12.5 million, he testified "I thought it was a frivolous indication of an offer".

His son, Marshall Katz, a Vice President of Papercraft, handled much of the effort by Papercraft to divest CPS. Again, there was no indication whatsoever of consideration being given to the urgency of divestiture compared with the asking price of $37.5 million.

This Court finds that Papercraft's "asking price" was unreasonable and only discouraged inquirers without consideration of the unconditional divestiture requirement. Though the FTC had on numerous occasions brought this forcibly to Papercraft's attention, it was not until January of 1974, after the deadline for divestiture, that Papercraft allegedly "redoubled" its efforts to divest CPS possibly by lowering the price to $29 million. This was still unreasonably above any market interest generated up to that time. Finally Papercraft lowered its price to $20 million, but the entire course of conduct shows that Papercraft pursued a subjectively desired price in complete disregard of the Divestiture Order. As this Court previously held: "the Order suggests noth-

ing to indicate that Papercraft's divestiture was to be affected by the price it would receive . . . [and] Defendant's bargaining position may well have been weakened by virtue of the Order, but its position was the product of Defendant's earlier violations of the antitrust laws." (Page 8 of Opinion on Motion for Partial Summary Judgment filed March 11, 1975).

In addition, as noted above, Papercraft failed to follow up the offer of Kraftco (through an intermediary) at $25.5 million, and the offer from Borden at $20 million, and the offer at $13 million by West Bend Company, a division of Dart Industries, Inc., and an offer of $15 million made by Wyomissing Corporation. In other instances, Papercraft rejected offers without indicating any willingness to reduce their asking price of $29 million. Undoubtedly, one of the effects of the artificially high price in the face of market resistance, was the discouraging of medium and small prospective inquirers. This effect was brought to Papercraft's attention as early as December 19, 1973 by the FTC staff member who wrote to Papercraft's attorneys that there was some disappointment that its efforts had focused only on "very large, broad based consumer products companies". (Govt. Exhibit 33). Furthermore, the FTC on March 1, 1974, pointed out to Papercraft that its use of the terms "selling price" and its statement that the price was to be "payable in cash", represented an inflexible position which was unacceptable "in that it tends to preclude interest and does not comport with the duty of respondent to accomplish the divestiture which is already overdue." (Govt. Exhibit 34).

It thus becomes apparent from the entire record before us that it was Papercraft's failure to realistically approach the subject of divestiture, and to take the necessary steps therefor within the six month period provided by the FTC Order, that gave rise to the necessity of the instant proceedings.

Papercraft had the unconditional obligation to divest within six months, or as an alternative it could have used a spin-off to its shareholders as contemplated by Paragraph III of the FTC Order. However, Papercraft, deliberately disregarded the spinoff alternative, and devoted all of its attention to the sale to an acquirer. It was not until January of 1974, after the December 16, 1973 Divestiture Order deadline, that Papercraft initiated any substantial divestiture efforts. Had Papercraft, in the first six months after the effective date of the FTC Order, not persisted in its limited approach to large prospects, and its insistence on the avoidance of advertising, it seems possible that divestiture would have been entirely possible within the established time limitations. This possibility is evidenced by the fact that within six months from the first advertisement of CPS on January 8, 1974, Dart Industries, Inc., on June 28, 1974, made a substantial offer of $13 million. This offer was made despite the deterrent effect of Papercraft's price inflexibility. Its acceptance within the six month period would have provided the FTC with an opportunity to appraise Dart's qualifications as an acquirer. Wyomissing Corporation made its inquiry at $15 million on June 5, 1974, and this inquiry was quickly rejected. This establishes that Papercraft could have presented a divestiture proposal within the six month period prescribed by the FTC Order.

On the issue of good faith, it is apparent that Papercraft did not exercise that good faith which the Order required.

## II. THE INJURY TO THE PUBLIC

█ It is the major premise of the anti-trust laws that reduction of competition through illegal mergers is injurious to the public. Under the FTC's Opinion of June 30, 1971, it stated that Papercraft's acquisition of CPS affected or would probably affect competition in the following ways:

"V. Injury to Competition

The acquisition involved in this proceeding is so far outside the pale of permissible combinations that, even if we accepted respondent's efforts to expand the universe figure to double or more the figure we believe to be reasonably correct and to place the two firms in question in separate 'submarkets' of the overall gift-wrap field, we would still be constrained to enter an order restoring this acquired firm to its former status as a separate full-line gift-wrap producer. No matter how the product markets (or submarkets) might be defined, the facts still would remain, as noted, that the 1st and 2nd largest gift-wrap manufacturers have been combined into one; that the combination thus created is more than twice the size of the next-largest competitor; that those two firms were the most likely entrants into all aspects of gift-wrap production; that the number of significant firms in the industry has been decreasing; that the trade expects this trend to continue, with only four significant firms ultimately remaining in the industry; and that there is no prospect for any new firms to enter the industry in the future. The case law simply does not sanction acquisitions of this kind." (citations omitted). [Govt. Exhibit 21 at p. 16]. (footnote omitted).

As previously noted, as long as Papercraft holds CPS, it benefits by an average profit of better than $5,000 a day. As discussed in the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) (at p. 317):

"[Competition is valued]  .  .  . (1) because the actual level of prices in competitive markets should in the short run more accurately reflect the influence of demand and of cost, and thus in the long run help guide the flow of capital and other resources toward the most productive possible uses; (2) because the goad of compe-

tition provides powerful and pervasive incentives for product innovations and product development, and for long-run cost reduction, both through improved technology and improved management; . . . (3) because competitive conditions in business should lead to an equitable diffusion of the resulting real income among consumers and factors of production; and (4) . . . because the more flexible prices of competitive markets should make it easier and cheaper for the economy to adjust to industrial fluctuations. . . . "

It is, therefore, apparent that to the extent that Papercraft profits from the retention of a lucrative subsidiary, it and other respondents in divestiture cases will be encouraged to delay divestiture ordered by the FTC. It is also apparent that civil penalties must take into account the extent to which the public has been harmed through the repression of competition and the profit which Papercraft has received is an indication of this harm.

## IV. PAPERCRAFT'S ABILITY TO PAY

It is noted in the District Court Opinion in United States v. J. B. Williams Company, Inc., 354 F.Supp. 521, 548 (S. D.N.Y.1973) (at p. 548):

"The court believes it appropriate to consider the financial ability of defendants to pay the penalties demanded by the Government in Section 5(*l*) actions. While imposition of maximum penalties against a large corporation may amount to little more than a slap on the wrist, the same penalties may throw a small enterprise out of business. The severity of the sanction imposed necessarily depends on the ability of each particular defendant to pay whatever fines are assessed."

In the instant case, it is noted that CPS has earned $1,002,294 on sales of $20,739,017 in 1974. (Govt. Exhibit CR–20 at 4573). In addition, the Wall Street Journal reported on March 7, 1975 that Papercraft has earned $5.3 million in 1974 on sales of $82.8 million. There is a present ability to pay even to the maximum, penalties of $10,000 per day as set by the Act.

## V. THE PENALTY TO BE APPLIED

In the present action, the Government seeks penalties of $10,000 a day for Papercraft's "continuing failure or neglect to obey". The statute makes each day of such failure or neglect to divest under a final order a separate violation. The Defendant Papercraft took the position that in an action for civil penalties, only $5,000 a day could be assessed on an alleged violation of Section 7 of the Clayton Act, as amended. But this assertion is in error as we have noted hereinabove.

■ However, before coming to a conclusion as to the amount of the penalty to be assessed, we must first determine the time involved. Papercraft argues that no penalties may be assessed prior to March 29, 1974, the date that it claims it first received notice of finalization of the FTC Order. But this assertion is without merit because the Order is perfectly clear that divestiture was required by December 16, 1973. Penalties must, therefore, be assessed from that date. This point was recently stressed by the Eighth Circuit in the following comments which appear in United States v. Beatrice Foods, Co., *supra*, (at pp. 1265, 1266–1267, 1269):

"Beatrice argues that *no* penalty could be imposed before the FTC gave notice that Beatrice's conduct was in violation of the cease and desist order. Assessment of penalties for conduct occurring before such notice would, according to Beatrice, violate due process.

\*    \*    \*    \*    \*    \*

We are thus satisfied that no notice is required under the statutes. How-

ever, this does not resolve the constitutional challenge to the imposition of penalties before notice of violation is given. As indicated Beatrice asserts that notice was not given until the complaint was filed. On the other hand, the government's position is that the cease and desist order itself gives sufficient notice of what conduct is proscribed.

\* \* \* \* \* \*

We think the basic question necessarily turns on whether the order itself is sufficiently clear to place Beatrice on notice of the prohibited conduct. . . . Our examination satisfies us that the FTC decree . . . was in fact sufficiently precise in terminology to place Beatrice on notice of its wrongful action in its transactions with Maple Island Dairies. . . . "

Thus, in each civil penalty case in which the "notice" argument was raised, the Court has flatly rejected it. United States v. J. B. Williams Company, Inc., *supra;* Federal Trade Commission v. Consolidation Foods Company, 1972—2 Trade Cas. ¶ 75,431 (S.D.N.Y.1974); United States v. Swingline, Inc., 371 F. Supp. 37, 45 (E.D.N.Y.1974).

This Court, therefore, holds that the civil penalty in this case is to be assessed beginning with December 17, 1973, and running through the date of this Order.

■ This Court has carefully considered the teachings of *Beatrice Foods* (a penalty of $200 a day), and many other cases as set forth in United States v. Swingline, Inc., *supra,* at p. 46 (fixing penalties at various amounts, less than $10,000 a day). In considering Papercraft's financial ability to pay, and the harm caused by the delay, the degree of bad faith, and the benefit received by Papercraft, we do not think that the penalty assessed should be the maximum, however, it must be large enough to deter Papercraft and anyone else in the future from showing as little concern as Papercraft did for the need to meet the FTC timetable.

A penalty of $7,500 a day is determined to represent a fair consideration of all of the factors involved, for a total of $3,817,500.

## INJUNCTION

■ In addition to the civil penalties, injunctive relief for violations of FTC Orders is provided by Section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*):

> "The United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of final orders of the Commission."

A consideration of the evidence presented in this case requires a careful balancing of the urgency of prompt compliance with the practicalities of developing a realistic plan for divestiture. After consideration of the details of many offers made to Papercraft, the extensive interest shown by many substantial corporations, and the results received from public advertising, it is the opinion of this Court that Papercraft must be required to submit a divestiture plan subject to approval by the FTC. It is further the opinion of the Court that such a plan can be developed for submission within sixty (60) days from the date of this Opinion and Order, and it will be so ordered.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

An appropriate Order will be entered.